1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| GUADALUPE GUERRERO, | ) | Case No. EDCV 09-1654 JC |
|---|---|---|
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION AND |
| v. | ) | ORDER OF REMAND |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

18  **I.    SUMMARY**

19      On September 3, 2009, plaintiff Guadalupe Guerrero ("plaintiff") filed a

20  Complaint seeking review of the Commissioner of Social Security's denial of

21  plaintiff's application for benefits.  The parties have filed a consent to proceed

22  before a United States Magistrate Judge.

23      On December 16, 2009, plaintiff filed Plaintiff's Motion for Summary

24  Judgment and/or Remand ("Plaintiff's Motion").  On January 15, 2010, defendant

25  filed Defendant's Opposition to Plaintiff's Opening Brief and Memorandum (the

26  "Opposition").  The Court has taken Plaintiff's Motion under submission without

27  oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; September 4, 2009 Case

28  Management Order ¶ 5.

1

1   Based on the record as a whole and the applicable law, the decision of the
2   Commissioner is REVERSED AND REMANDED for further proceedings
3   consistent with this Memorandum and Opinion and Order of Remand because the
4   Administrative Law Judge's ("ALJ's") residual functional capacity determination
5   is not based on substantial evidence.

6   **II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE**
7          **DECISION**

8          On September 4, 2002, plaintiff effectively filed the operative application
9   for disability insurance benefits ("DIB").  (Administrative Record ("AR") 88-90).
10  Plaintiff asserted that she became disabled on September 11, 2001, due to an eye
11  problem and pain in her shoulders and feet.  (AR 102, 107).  On December 14,
12  2004, the ALJ conducted a hearing ("Pre-Remand Hearing") at which the ALJ
13  heard testimony from plaintiff (who was represented by counsel), a medical
14  expert, and a vocational expert.  (AR 322-60).  On May 13, 2005, the ALJ found
15  that the plaintiff was not disabled ("The Pre-Remand Decision").  (AR 13-24).  On
16  April 20, 2006, the Appeals Council denied review.  (AR 6-8).  On April 20, 2007,
17  a federal district court remanded the case to the Commissioner for further
18  proceedings.  (AR 404-21).  Following the remand on March 10, 2009, a new ALJ
19  conducted another hearing ("Post-Remand Hearing") at which he heard testimony
20  from plaintiff (who was represented by counsel) and a vocational expert.   (AR
21  542-57).

22         On June 19, 2009, the new ALJ determined that plaintiff was not disabled
23  through the date of the decision ("Post-Remand Decision").  (AR 364-73).
24  Specifically, the ALJ found:  (1) plaintiff suffered from the following severe
25  impairment: a congenital anomaly of the cerebellum (AR 366); (2) plaintiff's
26  impairments, considered singly or in combination, did not meet or medically equal
27  one of the listed impairments (AR 367); (3) plaintiff retained the residual
28  ///

functional capacity to perform medium work with various limitations (AR 367);[1]
(4) plaintiff could perform her past relevant work as a warehouse worker,
assembler, thrift store stocker, shoe stocker, shoe labeler, and cleaner (AR 372).

## III. APPLICABLE LEGAL STANDARDS

### A. Sequential Evaluation Process

To qualify for disability benefits, a claimant must show that she is unable to
engage in any substantial gainful activity by reason of a medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of at least twelve
months. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C.
§ 423(d)(1)(A)). The impairment must render the claimant incapable of
performing the work she previously performed and incapable of performing any
other substantial gainful employment that exists in the national economy. Tackett
v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

In assessing whether a claimant is disabled, an ALJ is to follow a five-step
sequential evaluation process:

(1)    Is the claimant presently engaged in substantial gainful activity? If
       so, the claimant is not disabled. If not, proceed to step two.

(2)    Is the claimant's alleged impairment sufficiently severe to limit
       her ability to work? If not, the claimant is not disabled. If so,
       proceed to step three.

---

[1]More specifically, the ALJ determined that plaintiff:

can occasionally lift and/or carry 50 pounds and sit for six hours; she has
unlimited push and pull within the weight restrictions noted herein; [s]he can
occasionally climb ramps and stairs, but is precluded from climbing ladders,
ropes, and scaffolds; she is precluded from work that requires balancing; she can
occasionally stoop, kneel, crouch, and crawl; and she can do only simple routine,
repetitive, non-public tasks, since that is the only kind of work she has ever done.

(AR 367).

(3)     Does the claimant's impairment, or combination of
        impairments, meet or equal an impairment listed in 20 C.F.R.
        Part 404, Subpart P, Appendix 1? If so, the claimant is
        disabled. If not, proceed to step four.

(4)     Does the claimant possess the residual functional capacity to
        perform her past relevant work?[2] If so, the claimant is not
        disabled. If not, proceed to step five.

(5)     Does the claimant's residual functional capacity, when
        considered with the claimant's age, education, and work
        experience, allow her to adjust to other work that exists in
        significant numbers in the national economy? If so, the
        claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th
Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

        The claimant has the burden of proof at steps one through four, and the
Commissioner has the burden of proof at step five. Bustamante v. Massanari, 262
F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679
(claimant carries initial burden of proving disability).

        **B.     Standard of Review**

        Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of
benefits only if it is not supported by substantial evidence or if it is based on legal

---

[2]Residual functional capacity is "what [one] can still do despite [ones] limitations" and
represents an "assessment based upon all of the relevant evidence." 20 C.F.R. § 404.1545(a). In
determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence
in the record, including medical records, lay evidence, and the effects of symptoms, including
pain, that are reasonably attributed to a medically determinable impairment. Robbins v. Social
Security, 466 F.3d 880, 883 (9th Cir. 2006) (citations omitted). Careful consideration should be
given to any evidence about symptoms because subjective descriptions may indicate more severe
limitations or restrictions than can be shown by medical evidence alone. Id. (citations omitted).

1   error.  <u>Robbins v. Social Security Administration</u>, 466 F.3d 880, 882 (9th Cir.

2   2006) (citing <u>Flaten v. Secretary of Health & Human Services</u>, 44 F.3d 1453, 1457

3   (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable

4   mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>,

5   402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a

6   mere scintilla but less than a preponderance.  <u>Robbins</u>, 466 F.3d at 882 (citing

7   <u>Young v. Sullivan</u>, 911 F.2d 180, 183 (9th Cir. 1990)).

8        To determine whether substantial evidence supports a finding, a court must

9   "'consider the record as a whole, weighing both evidence that supports and

10   evidence that detracts from the [Commissioner's] conclusion.'"  <u>Aukland v.</u>

11   <u>Massanari</u>, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting <u>Penny v. Sullivan</u>, 2 F.3d

12   953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming

13   or reversing the ALJ's conclusion, a court may not substitute its judgment for that

14   of the ALJ.  <u>Robbins</u>, 466 F.3d at 882 (citing <u>Flaten</u>, 44 F.3d at 1457).

15   **IV.   DISCUSSION**

16        Plaintiff contends that the ALJ erred at steps four and five in determining

17   that plaintiff retained the residual functional capacity to perform her past relevant

18   work.  (Plaintiff's Motion at 4-10).  Specifically, plaintiff argues that her

19   symptoms as established in the record, <i>i.e.</i>, chronic severe headaches, vision

20   fluctuations, imbalance, recurrent weakness and fatigue, and depression, anxiety,

21   and loss of concentration, render her unable to perform work on a sustained basis

22   or to maintain competitive work activity.  (Plaintiff's Motion at 6, 8).  Plaintiff

23   suggests that the ALJ's residual functional capacity determination did not comply

24   with Social Security Ruling ("SSR")  96-8p.  (Plaintiff's Motion at 7).  Plaintiff

25   also argues that the ALJ did not properly consider plaintiff's limitations and the

26   demands of her past relevant work under SSR 82-61 and SSR 82-62 in finding that

27   plaintiff was not disabled.  (Plaintiff's Motion at 9-10).  Finally, plaintiff argues

28

1  that the ALJ did not provide clear and convincing reasons for rejecting plaintiff's

2  credibility.  (Plaintiff's Motion at 10).

3      For the reasons discussed below, considering the record as a whole, the

4  Court finds that the ALJ's residual functional capacity assessment is not supported

5  by substantial evidence.

6      **A.    The ALJ's Residual Functional Capacity Assessment Is Not**

7            **Supported by Substantial Evidence**

8      As summarized above, on remand the ALJ found that plaintiff retained the

9  residual functional capacity to perform a limited range of medium work.  (AR

10 367).  The ALJ incorporated by reference the Pre-Remand Decision, which

11 summarized the medical evidence in the record, including evidence from

12 plaintiff's treating physicians.[3]  (AR 18-21, 368-72).  However, in determining

13 plaintiff's physical limitations, the ALJ relied on the opinions of two non-

14 examining, non-treating state agency physicians – Drs. Thu N. Do and Stuart A.

15 Brodsky – as consistent with the opinion of consultative internal medicine

16 examiner Dr. Nicholas Lin.  (AR 371-72) (citing AR 218-26, 453-59, 484-89).  In

17 determining plaintiff's mental limitations, the ALJ relied on a neurological

18 consultative examiner, Dr. Robert A. Moore, who assertedly opined that plaintiff

19 has no clinically detectable mental impairment.  (AR 367) (citing AR 447-50).

20 The ALJ otherwise rejected Dr. Moore's opinion about plaintiff's physical

21 limitations.  (AR 371).

22     The opinions of such non-treating, non-examining state agency physicians

23 or examining physicians may serve as substantial evidence to support an

24

25     [3]Although plaintiff recites medical evidence from her treating physicians, she does not

26 assert that the ALJ rejected, or improperly rejected the treating physician opinions, or
   impermissibly adopted the opinions of other medical professionals.  Instead, she generally asserts

27 that the record as a whole does not support the ALJ's residual functional capacity determination

28 or a finding that she could perform her past relevant work.  (Plaintiff's Motion at 2-7).

administrative decision where the opinions are supported by independent clinical findings or other evidence.  See Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  A review of the record reveals that the opinions on which the ALJ relied were not as the ALJ reported and do not provide substantial evidence to support the ALJ's step four determination.

### 1.     The Record of Plaintiff's Impairments

Plaintiff's initial treating physician, Dr. Tarek Mahdi, referred plaintiff to Dr. Waseem Ibrahim for a neurological consultation conducted on January 17, 2002.  (AR 193-94; see also AR 109 (noting that Dr. Mahdi began treating plaintiff for headaches and pain on December 27, 2001)).  Plaintiff had complained to Dr. Mahdi of eye movement, headaches and dizziness.[4]  (AR 192). Plaintiff reported  headaches since childhood, now associated with blurry vision, nausea, dizziness, vertigo, and "dancing" eyes.  (AR 193).  Dr. Ibrahim noted that plaintiff seemed to have an impairment with her walking since childhood.  (AR 193).  Dr. Ibrahim observed that plaintiff had a "slightly spastic gait with shuffling

---

[4]In a Disability Report dated March 1, 2002, plaintiff reported that she had pain in her shoulder and feet and an eye problem because her eyes moved frequently and she could not control them. (AR 107; see also AR 130 (later Disability Report noting that plaintiff also suffered from bad headaches); AR 144, 146 (Reconsideration Disability Report noting that plaintiff's condition was worse and that plaintiff also suffered from leg pain, had trouble walking, and could not see well)).  Plaintiff also reported that she had asthma but did not list it as a condition limiting her ability to work. (AR 107, 114).  Plaintiff was taking Naproxen for a chest muscle problem, Amitriptyline for "head sleep," Zomig for migraines, and extra strength Tylenol for pain. (AR 112, 114).  "Naproxen" per Merriam-Webster's Online Medical Dictionary (2010), is "an anti-inflammatory analgesic. . . administered especially to treat arthritis."  See http://www.merriam-webster.com/medlineplus/naproxen (last visited Sept. 22, 2010). "Amitriptyline" is "a tricyclic antidepressant. . . used to treat migraine headaches and neuropathic pain as well as depression."  See http://www.merriam-webster.com/medlineplus/amitriptyline (last visited Sept. 22, 2010).  There is evidence that in January 2005, plaintiff was still taking an antidepressant (nortriptyline). (AR 170).  Plaintiff, however, did not assert any limitations based on her depression.  (AR 107, 130, 144-46, 171-73).

1  of the right foot." (AR 194).  Dr. Ibrahim opined that plaintiff had "mild, right

2  hemiparesis and a nystagmus that may be related to perinatal pathology or mild

3  cerebral palsy."[5]  (AR 194).  Dr. Ibrahim ordered an MRI and EEG and prescribed

4  medication for the headaches.[6]  (AR 194).

5       Plaintiff underwent an MRI of her brain on January 28, 2002. (AR 244-46).

6  The MRI revealed "loss of the parenchyma of the right cerebellar hemisphere and

7  the majority of the vermis" with "compensatory dilation of the fourth ventricle,"

8  "mild atrophy of portions of the remaining left cerebellar hemisphere," "probable

9  atrophy and reduced size of the brain stem," "mild to moderate dilation of the

10 lateral and third ventricles," "communicating hydrocephalus," and an "absence of

11 the septum pellucidum posteriorly." (AR 245-46).

12      Dr. Lilian Chang performed an Internal Medicine Evaluation of plaintiff on

13 November 7, 2002. (AR 208-12).  Dr. Chang did not review any of plaintiff's

14 medical records in evaluating plaintiff but rather relied on plaintiff's report of her

15 medical history. (AR 208).  Plaintiff complained of back pain, chest pain, and

16 having headaches at least two or three times per day that last for hours with

17 associated dizziness. (AR 208).  Dr. Chang noted mild tenderness to palpation of

---

[5]"Hemiparesis" is "muscular weakness or partial paralysis restricted to one side of the body."  See http://www.merriam-webster.com/medlineplus/hemiparesis (last visited Sept. 22, 2010).  "Nystagmus" is "involuntary usually rapid movement of the eyeballs (as from side to side) occurring normally with dizziness during and after body rotation or abnormally following head injury or as a symptom of a disease."  See http://www.merriam-webster.com/medlineplus/ nystagmus (last visited Sept. 22, 2010).

[6]At around this time state agency physician, Dr. Joseph Traxler, prepared a Physical Residual Functional Capacity Assessment Form for plaintiff.  The form, dated May 9, 2002, notes no limitation beyond avoiding unprotected exposure to heights and to hazardous machinery, and no commercial use of a motor vehicle. (AR 200-07).  Dr. Traxler had reviewed Dr. Ibrahim's evaluation, but noted there were no treating or evaluating medical source statements, and found no severe impairments "assuming some validity" to Dr. Ibrahim's opinion. (AR 207).  Dr. Traxler also noted that plaintiff's "MRI [was] reported as normal."  (AR 207).  However, contrary to Dr. Traxler's notes, plaintiff's MRI report was not normal.  (AR 244-46).

the chest and back but otherwise normal findings upon physical examination, including plaintiff having a gait within normal limits.  (AR 209-11).  An x-ray of plaintiff's chest and spine showed no abnormalities.  (AR 211, 213).  A visual acuity test from November 7, 2002, showed plaintiff had 20/40 vision without glasses.  (AR 214).  Dr. Chang opined that plaintiff would be capable of performing medium work with no noted limitations.  (AR 211-12).

At this time, the Administration requested that state agency physician Dr. Do also evaluate plaintiff's residual functional capacity.  (AR 216-17) (Consultation Request dated November 25, 2002, noting that plaintiff's allegations appear "partially credible" given that the existing medical record did not support the severity alleged).  Dr. Do completed a Physical Residual Functional Capacity Assessment form on November 25, 2002, finding that plaintiff could perform medium work, but noting that plaintiff should never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to fumes, odors, dusts, gases, etc., and hazards.  (AR 218-25).  A note indicates that state agency physician Dr. Brodsky reviewed the file and affirmed Dr. Do's assessment on the same day. (AR 225-26).  Dr. Brodsky noted, "no new material evidence sufficient to support modification of prior medium [physical residual functional capacity].  I concur." (AR 226).

Importantly, at the time of these evaluations finding that plaintiff could do medium work, it appears that the state agency physicians and Dr. Chang had not reviewed the report of plaintiff's MRI.  Those records were provided to the Administration on April 12, 2004.  (AR 233) (letter submitting additional medical records).

Subsequent medical records from plaintiff's treating physician, family practitioner Dr. Yukuen Chung, acknowledge plaintiff's cerebellar dysfunction and associated limitations.  On July 9, 2003, Dr. Chung noted that plaintiff "has evidence of cerebellar dysfunction" and that a prior MRI  "revealed cerebellar

9

1  atrophy/hydrocephalus." (AR 228).  Dr. Chung also noted that plaintiff suffered

2  from headaches, dizziness and ataxia [imbalance].  (AR 228-29).  Dr. Chung

3  estimated that plaintiff would be unable to do her regular work until October 1,

4  2003.  (AR 228).  Dr. Chung noted that further neurological evaluation was

5  necessary and opined that plaintiff "very likely. . . will be permanently disabled."

6  (AR 229).[7]   In an earlier note, Dr. Chung noted that plaintiff presented with a

7  "slight ataxic gait, left esotropia and nystagmus."[8]  (AR 230; see also AR 234-41

8  (treatment notes reflecting same)).

9      Dr. Chung's treatment notes from February 26, 2004 through October 2,

10  2008 show that, among other things, plaintiff complained of  headaches, nausea,

11  dizziness, forgetfulness, lack of focus/concentration, difficulty with balance,

12  wandering eyes/blurred vision, numbness in her left side, pain in her right arm

13  following a fall, and leg pain.  (AR 277-301, 439-43, 446, 461-83, 503-04, 511-

14  19).  Dr. Chung continued to assess plaintiff with cerebellar dysfunction/

15  congenital malformation and congenital nystagmus.  (AR 277, 279-80, 283-85,

16  _____

17      [7]Dr. Chung completed a "Medical Report Memorandum" for plaintiff dated November
18  23, 2004, opining that plaintiff could not work.  (AR 271-75).  Dr. Chung noted that plaintiff has
    frequent headaches, poor concentration, poor memory, and difficulty with balance/eye sight.
19  (AR 271).  Dr. Chung diagnosed plaintiff with "cerebellar dysfunction possible congenital
    anatomic structural defect of cerebellum" and headaches.  (AR 271).  Dr. Chung noted that
20  plaintiff tested positive for nystagmus, hyperreflexia, and intermittent ataxia with positive
    Romberg's signs.  (AR 271).  "Romberg's signs" are indicative of "diseases of the nervous
21  system consisting of a swaying of the body when the feet are placed together and the eyes are
    closed."  See http://www.merriam-webster.com/medlineplus/romberg (last visited Sept. 23,
22  2010).  Dr. Chung was treating plaintiff with neurontin and noted she was stable.  (AR 272).  Dr.
    Chung checked that plaintiff would not have the ability to engage in sustained employment.  (AR
23  272).  Dr. Chung checked that plaintiff has the ability to stand, sit and walk a total of only one-
    half hour out of an eight-hour workday, with postural limitations as "occasional," manipulative
24  limitations, no using feet for repetitive motions or foot controls, occasional lifting of 25 to 50
25  pounds, and occasional carrying of 11 to 24 pounds.  (AR 273-74).  Dr. Chung noted that
    plaintiff had been referred for further neurological evaluation and possible treatment.  (AR 274).
26
27      [8]"Esotropia" means "cross-eye."  See http://www.merriam-webster.com/medlineplus/
28  esotropia (last visited Sept. 23, 2010).

10

291).  Dr. Chung also continued to observe mild ataxia and hyperreflexia due to plaintiff's cerebellar dysfunction.  (AR 441, 520).

Meanwhile, records from the Riverside Community Hospital show that plaintiff presented to the emergency room on January 18, 2005 with complaints of right-side numbness and right facial droop and anxiety.  (AR 428-33).  A CT scan showed a 4.4 x 4.9 cm lesion at the right cerebellar region, "likely representing encephalomalacia, less likely representing a cystic lesion," mild dilation of the lateral ventricles, and "left ethmoidal sinus disease."  (AR 307, 428).  An MRI of plaintiff's brain showed no evidence of a mass or infarct or hemorrhage.  (AR 428).  The MRI of plaintiff's brain again showed an absence of the right cerebellar hemisphere and inferior vermis, "with questionable presence of the falx cerebelli," "apparent partial absence of the septum pellucidum with hypoplastic and thinned corpus callosum and ventriculomegaly," and "questionable mild hydromyelia." (AR 305-06).  An MRI of plaintiff's cervical spine showed mild levoscoliosis and straightening of the normal cervical lordosis with congenital narrowing of the central canal at C3-C4.  (AR 303-04).  Doctors prescribed medicine and released plaintiff.  (AR 428).  Plaintiff returned to the emergency room on June 12, 2005, with complaints of increasing left-side numbness.  (AR 423-25).  A CT scan of plaintiff's brain revealed extensive encephalomalacia over the right cerebellum and associated atrophy and ventriculomegaly.  (AR 424, 435).  The scan showed no acute changes since the CT scan plaintiff had done in January 2005.[9]  (AR 424, 435).

---

[9]Plaintiff later went to the emergency room at the Arrowhead Regional Medical Center on September 14, 2008 with complaints of a headache with numbness to both upper extremities, right side face and tongue "twisting," dizziness, vision changes, and weakness all over.  (AR 530-32).  The doctor noted cerebellum dysfunction with slight facial asymmetry and ordered a MRI and CT scan.  (AR 530, 532).  The MRI showed evidence of an old right cerebellar infarction with no evidence of mass lesion but with mild hydrocephalus.  (AR 526).  The CT scan of plaintiff's brain found "probable posterior fossa mass versus cystic encephalomalacia," and "mild to moderate hydrocephalus."  (AR 527).

11

Consultative neurologist, Dr. Robert Moore, completed a Neurological Evaluation of plaintiff dated February 7, 2005.[10] (AR 311-14).  Dr. Moore reviewed plaintiff's medical records consisting of Dr. Chung's treatment notes from February 2004 through November 2004 (AR 277-301) and one of plaintiff's MRI scans.  (AR 311).  Plaintiff complained of problems with balance, numbness of the right arm, and problems performing distal fine coordinated movements with the right fingers.  (AR 311).  Plaintiff denied any recent changes in her vision or hearing and reported that her memory and thinking were "okay" for the most part.  (AR 311).  Upon examination, Dr. Moore noted that plaintiff had "very minimal dyskiadochokinesis in the right fingers and toes," and "very mild dysmetria without an associated transverse tremor" on right finger-nose-finger testing.[11]  (AR 313).  Dr. Moore also noted that plaintiff exhibited "minimal gait instability," having "some difficulty walking on her heels and toes because of poor balance," and a "mildly impaired" tandem gait "with a tendency to fall in either direction."  (AR 313).  Plaintiff had "scattered sensory loss in no specific pattern in the right upper extremity."  (AR 313).  Dr. Moore diagnosed plaintiff with a congenital abnormality of the cerebellum "likely accounting for her current

---

[10]The ALJ ordered the neurological evaluation after Dr. John Morse, the medical expert who testified at plaintiff's first administrative hearing in December 2004, testified that the medical evidence shows that plaintiff has "degenerative pathology" in her cerebellum which would result in an abnormal gait called "ataxia," some visual disturbances called "nystagmus," and may or may not relate to plaintiff's headaches.  (AR 347-48).  Dr. Morse said it would help to have a neurological evaluation given plaintiff's brain MRI.  (AR 347, 350).  Dr. Morse could not opine whether plaintiff met or equaled a listed impairment because there was no good neurological evaluation in the record.  (AR 348).  Dr. Morse said he did not "even have a handle on how weak [plaintiff] really is."  (AR 348).

[11]"Dysdiadochokinesia" is an "impairment in the ability to make movements exhibiting a rapid change of motion that is caused by cerebellar dysfunction."  See http://www.merriam-webster.com/medlineplus/dysdiadochokinesia (last visited Sept. 23, 2010).  "Dysmetria" is an "impaired ability to estimate distance in muscular action."  See http://www.merriam-webster.com/medlineplus/dysmetria (last visited Sept. 23, 2010).

symptomatology." (AR 313).  Dr. Moore opined that plaintiff could lift and carry

30 pounds intermittently and 15 pounds frequently, could frequently push and pull

with the right arm but would have difficulty operating hand controls, should not

use power tools, could frequently perform simple gripping movements and distal

fine coordinate movements with the right fingers, and has unrestricted use of the

left upper extremity.  (AR 313-14).  Plaintiff could sit in an unrestricted manner,

but due to plaintiff's mild gait instability, plaintiff could stand and walk four hours

in an eight-hour day in 30- to 40-minute intervals. (AR 314).  Plaintiff could

occasionally bend and stoop, could operate foot controls, but could not climb,

balance or work at heights.  (AR 314).[12]  Dr. Moore provided a Medical Source

Statement of Ability to Do Work-Related Activities (Physical) dated February 14,

2005, noting similar limitations.  (AR 317-20).

Dr. Moore completed a second Neurological Evaluation dated September

11, 2006.  (AR 447-50).  Plaintiff provided to Dr. Moore a 1978 report noting that

plaintiff had a skull fracture shortly after birth, resulting in a cerebellar deformity

and strabismus surgery.  (AR 447).  Upon examination, Dr. Moore observed that

plaintiff had a minimally wide-based gait, difficulty walking on her heels and toes

because of poor balance, and mildly to moderately impaired tandem gait with a

tendency to fall to the left.  (AR 449).  Dr. Moore diagnosed plaintiff with a

history of remote cerebellar trauma with residual gait instability and nystagmus.

(AR 449).  Dr. Moore noted that plaintiff's complaints of blurred vision are likely

related to her nystagmus.  (AR 450).  Like his previous assessment, Dr. Moore

---

[12]Given the standing/walking limitations, Dr. Moore's evaluation essentially was that plaintiff could perform a limited range of sedentary work.  Social Security Ruling 83-10 instructs that "at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  Whereas, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  See SSR 83-10.  Social Security rulings are binding on the Administration.  Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).

assessed plaintiff with the ability to perform a limited range of sedentary work.
Specifically, Dr. Moore opined that plaintiff could lift and carry 40 pounds
intermittently and 20 pounds frequently and has unrestricted use of her upper
extremities.  (AR 449).  Plaintiff could sit in an unrestricted manner, but due to
plaintiff's mild gait deformity, plaintiff could stand and walk four to six hours in
an eight-hour day on level surfaces in one hour intervals.  (AR 449).  Plaintiff
could occasionally bend and stoop, but could not climb, balance or work at
heights.  (AR 449).

State agency physician Dr. Do reviewed Dr. Moore's findings and
completed a Physical Residual Functional Capacity Assessment dated September
27, 2006.  (AR 453-57).  Dr. Do noted that he "essentially agree[d]" with Dr.
Moore's "MSS" [medical source statement].  (AR 457; see also AR 458-59 (Dr.
Do's Case Analysis noting concurrence in summary of Dr. Moore's MSS which
included the limited ability "to stand and walk four to six hours" in an eight-hour
day); Opposition at 6 n.4 (defendant acknowledging that Dr. Do's assessment was
that plaintiff "could perform just under the medium exertional level")).  Where Dr.
Moore found that plaintiff could stand and/or walk four to six hours a day, Dr. Do
checked the box that plaintiff could stand and/or walk "about six hours" in an
eight-hour day – the box on the form closest to Dr. Moore's assessment.  (AR
457).

Consultative examiner, Dr. Nicholas Lin, prepared a Complete Internal
Medicine Evaluation for plaintiff dated October 26, 2007.  (AR 484-89).  Dr. Lin
reviewed Dr. Chung's treatment notes from 2004 through 2007 and Riverside
Community Hospital Emergency Room notes from January and June 2005.  (AR
485).  Plaintiff complained of asthma, uncontrollable eye movements, back pain,
scoliosis, and numbness of the right lower leg.  (AR 484).  On examination, Dr.
Lin reported that plaintiff had left grip strength of zero and right grip strength of
five and zero which was "likely due to suboptimal effort" because no weakness in

14

1   grip strength was observed during the examination.  (AR 486).  Dr. Lin observed

2   horizontal nystagmus in both eyes.  (AR 486).  Dr. Lin's neurologic examination

3   noted plaintiff's gait as "within normal limits" but with unsteady tandem gait.

4   (AR 488).  Unlike Dr. Moore, Dr. Lin opined that plaintiff could do medium work

5   with frequent bending, stooping, crouching and kneeling, limited to avoiding

6   walking on uneven terrain or at unprotected heights and avoiding areas with

7   smoke, fumes, dust, pollens and chemicals.  (AR 488).  Dr. Lin provided a

8   Medical Source Statement of Ability to Do Work-Related Activities (Physical)

9   dated October 26, 2007, noting similar limitations.  (AR 490-96).

10      Consultative psychiatrist, Dr. Paul De Silva, completed a psychiatric

11  evaluation dated November 20, 2007.  (AR 498-501).  Plaintiff complained of

12  depression with frequent crying spells, sadness, grief, daily anxiety, seeing figures

13  once or twice a week in her home, and forgetfulness.  (AR 498).  Plaintiff also

14  claimed to regularly forget the names of her four children.  (AR 499).  Dr. De

15  Silva observed that plaintiff was "uncoordinated in her walking style," with a

16  "tendency to walk sideways at an angle." (AR 499).  Dr. De Silva noted that

17  plaintiff had been on Effexor since May 2007.  (AR 499).  Dr. De Silva diagnosed

18  plaintiff with depressive disorder due to neurological problems and described her

19  as a slow learner who received special education in school.  (AR 500).

20      Dr. De Silva assigned a current Global Assessment of Functioning ("GAF")

21  score of 55.  (AR 500).[13]  Dr. De Silva opined that, among other limits, plaintiff

22  would have "moderate to severe" problems relating to coworkers and supervisors

23  _____

24      [13]A GAF score is the clinician's judgment of the individual's overall level of functioning.
    It is rated with respect only to psychological, social, and occupational functioning, without regard

25  to impairments in functioning due to physical or environmental limitations.  See American
    Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed.

26  2000) (hereinafter "DSM IV").  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat
    affect and circumstantial speech, occasional panic attacks or moderate difficulty in social,

27  occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM

28  IV at 34.

1  or the public, and "moderate to severe" impairment in her ability to concentrate,

2  remember and carry out simple instructions, and to respond to customary work

3  pressures, changes, and demands.  (AR 501).

4         **2.    Analysis**

5         The ALJ explained his residual functional capacity determination as

6  follows:

> I have given great weight to the most recent opinion of the State
> agency review physicians dated September 27, 2006 from Dr. Do,
> M.D.  It is essentially consistent with the earlier opinion from the
> State agency dated November 25, 2002.  In both of these evaluations
> the State agency physicians found the claimant could do medium
> exertional work with mild postural limits.  These opinions are
> consistent with the most recent consultative internal medicine
> examiner, Dr. Lin, Board eligible internal medicine, who examined
> the claimant on October 26, 2007.

16  (AR 371) (internal citations citing AR 218-26, AR 453-59 and AR 484-89

17  omitted)).  As summarized above, substantial evidence in the record does not

18  support the ALJ's findings.  Dr. Do did <u>not</u> find that plaintiff could do medium

19  exertional work in his most recent evaluation.  Dr. Do agreed with Dr. Moore's

20  medical source statement and specifically with Dr. Moore's opinion that Plaintiff

21  could stand and walk only four to six hours in an eight-hour day.  (AR 454, 457-

22  59).  Such a limitation translates to an ability to do only work at the sedentary

23  exertion level.  <u>See</u> SSR 83-10.[14]

24  _____

25         [14]If the ALJ had any doubt about whether Dr. Do disagreed with Dr. Moore's finding that
    plaintiff could stand and/or walk only four to six hours in a workday when Dr. Do checked the
26  box on Dr. Do's assessment form, the ALJ had a duty to recontact Dr. Do for clarification.  An
    ALJ has an affirmative duty to assist the claimant in developing the record at every step of the
27  sequential evaluation process. <u>Bustamante</u>, 262 F.3d at 954; <u>see also</u> <u>Webb v. Barnhart</u>, 433 F.3d
                                                                          (continued...)

1    While the earlier assessments by Drs. Chang, Do and Brodsky were for

2    work at a medium exertional level, these doctors, as noted above, did not have the

3    results from plaintiff's first MRI at the time they evaluated plaintiff.  Additionally,

4    while Dr. Lin opined that plaintiff had no standing or walking limitations based on

5    the neurological portion of his internal medicine examination (AR 488),

6    neurologist Dr. Moore examined plaintiff twice and found plaintiff incapable of

7    performing more than sedentary work.  (AR 314, 449).  The court notes the ALJ

8    should "generally give more weight to the opinion of a specialist about medical

9    issues related to his or her area of specialty than to the opinion of a source who is

10   not a specialist."  See 20 C.F.R. § 404.1527(d)(5); compare Kennelly v. Astrue,

11   313 Fed. Appx. 977, 978 (9th Cir. Feb. 27 2009) (ALJ entitled to consider area of

12   specialty when weighing opinion of nonexamining psychiatrists over examining

13   internal medicine practitioner).[15]

14       The ALJ explained his rejection of Dr. Moore's residual sedentary

15   functional capacity assessments as follows:

16       [Dr. Moore] said the claimant had a mild gait deformity, but then

17       gave her restrictive limitations of walking for only four hours out of

18       and eight-hour day.  This is not supported anywhere in the record or

19       by his own clinical findings and is not consistent with limitations

20       given by the State agency review physicians or the internal medicine

21       examiner.

22   (AR 371).

23

24   _____

25   [14](...continued)
     at 687. The ALJ's duty is triggered "when there is ambiguous evidence or when the record is

26   inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453,
     459-60 (9th Cir. 2001) (citation omitted).

27

28   [15]The Court may cite unpublished Ninth Circuit opinions issued on or after January 1,
     2007.  See U.S. Ct. App. 9th Cir. Rule 36-3(b); Fed. R. App. P. 32.1(a).

1    Again, substantial evidence in the record does not support the ALJ's
2    finding.  The record is replete with observations of plaintiff's gait deformities and,
3    as noted above, Dr. Do agreed with Dr. Moore's assessment based on Dr. Do's
4    review of the updated medical record.[16]

5    **B.      The Court Cannot Find from the Record that the ALJ's**
6    **Mischaracterization of the Evidence Was Harmless**

7        The ALJ's mischaracterization of the evidence calls into question the
8    validity of both the ALJ's residual functional capacity determination and the
9    ALJ's decision as a whole.  See Regennitter v. Commissioner, 166 F.3d 1294,
10   1297 (9th Cir. 1999) (materially "inaccurate characterization of the evidence"
11   warrants remand); Lesko v. Shalala, 1995 WL 263995 *7 (E.D.N.Y. Jan. 5, 1995)
12   (same).  Though there may be sufficient evidence in the record to support a
13   conclusion that plaintiff has the residual functional capacity the ALJ found, the
14   Court cannot conclude that the ALJ necessarily would have adopted the residual
15   functional capacity the ALJ adopted had the ALJ considered that Dr. Do agreed
16   with Dr. Moore's assessment – particularly since the ALJ assertedly afforded Dr.
17   Do's non-examining opinion "great weight" and rejected Dr. Moore's examining
18   opinion.

19       Nor can the Court find that the ALJ's error in mischaracterizing Dr. Do's
20   findings was harmless.  Even assuming that the ALJ would have adopted Dr. Do's
21   and Dr. Moore's more restrictive sedentary residual functional capacity
22   assessment, there is inadequate evidence in the record to establish at step five that
23   plaintiff could have worked.  Both vocational experts who testified at plaintiff's

24   _____

25       [16]The Court also notes that the ALJ characterized treating physician Dr. Chung's Medical
26   Report Memorandum as having "described that the claimant could do limited light work based
     on the checked statements on the form." (AR 371).  Dr. Chung's assessment, however, noted
27   greater limitations that Dr. Moore found to exist when Dr. Moore found that plaintiff would be
     limited to sedentary work.  Compare AR 271-75 (Dr. Chung's assessment) with AR 313-14, 449
28   (Dr. Moore's assessments).

administrative hearings described plaintiff's past jobs as requiring light to medium exertion levels.  (AR 351-52, 552-53).  Neither of the experts offered an opinion as to whether there would be work that a person with the limitations Dr. Moore found to exist could perform.

## V.    CONCLUSION[17]

For the foregoing reasons, the decision of the Commissioner of Social Security is reversed in part, and this matter is remanded for further administrative action consistent with this Opinion.[18]

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:   September 24, 2010

_____/s/_____
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

---

[17]The Court need not, and has not adjudicated plaintiff's other challenges to the ALJ's decision, except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate.

[18]When a court reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted).  Remand is proper where, as here, additional administrative proceedings could remedy the defects in the decision.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989); see also Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (remand is an option where the ALJ stated invalid reasons for rejecting a claimant's excess pain testimony).